# Illinois Official Reports

## Appellate Court

*People v. Lozano*, 2017 IL App (1st) 142723

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GILBERT LOZANO, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-2723 |
| Filed | March 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-15295; the Hon. Angela Munari Petrone, Judge, presiding. |
| Judgment | Affirmed in part; reversed in part. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Brenda K. Gibbs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion.<br>Justice Lampkin concurred in the judgment and opinion.<br>Presiding Justice Gordon dissented, with opinion. |

**OPINION**

¶ 1        Following a jury trial in the circuit court of Cook County, defendant Gilbert Lozano was convicted of unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2010)) and aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2010)), predicated on defendant not possessing a valid Firearm Owner's Identification (FOID) card. Defendant appeals his conviction, asserting the evidence was insufficient to find him guilty beyond a reasonable doubt where the State failed to present evidence that established he was a member of a "street gang" as provided by the statutory definition. According to defendant, section 24-1.8(c) of the Criminal Code of 1961 (Code) (720 ILCS 5/24-1.8(c) (West 2010)) explicitly provides that, for the purposes of this section, street gang "has the meaning ascribed to it in Section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act." The Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/10 (West 2010)), in turn, provides that the definition of a street gang means "any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." Defendant maintains that the State failed to present any evidence that the street gang he was alleged to be a member of "engages in a course or pattern of criminal activity" as defined by the Act, *i.e.*, "2 or more gang-related criminal offenses committed in whole or in part within this State when: (1) at least one such offense was committed after the effective date of this Act [Jan. 1, 1993]; (2) both offenses were committed within 5 years of each other; and (3) at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony under the Criminal Code of 1961." *Id.* For the reasons that follow, we agree and reverse defendant's conviction for unlawful possession of a firearm by a street gang member.

¶ 2                                   BACKGROUND
¶ 3        On September 15, 2011, defendant was charged by information with one count of unlawful possession of a firearm by a street gang member and six counts of AUUW. The matter proceeded to a jury trial on count one (unlawful possession of a firearm by a street gang member) and count three (AUUW predicated on defendant not having a valid FOID card).

¶ 4        Chicago police officer Victor Rivera testified that, on August 30, 2011, he and his partner Officer Daniel Lopez were assigned to the area of the 6100 block of South Keeler Avenue in the 8th District. As he was patrolling the area in his unmarked police vehicle, he was flagged down by a concerned citizen. As a result of this conversation, Rivera and Lopez began touring the nearby area of 61st Street and Karlov Avenue. When they arrived at 8:47 p.m., Rivera observed two Latinos and one Latina walking northbound on Karlov Avenue from 62nd Street. Rivera identified defendant in court as one of the Hispanic men he observed. Rivera recognized defendant, as he was an individual he had spoken to "several times in the past." But, as Rivera exited the vehicle, defendant immediately fled north on Karlov Avenue and then proceeded west on 61st Street. Rivera gave chase on foot.

¶ 5        Rivera and Lopez testified that, as defendant ran, he was holding the right side of his pants. Defendant proceeded to flee into a residential alley west of Karlov Avenue. According to Rivera, defendant began to slow down "[a]nd with his right hand that was holding the right

- 2 -

side of his waistband, he reached in and tossed with his right hand a black firearm over to the right area of where we were running." Rivera observed defendant throw the firearm over a fence and into a yard, but did not observe the weapon land on the ground. Lopez testified that, from his vehicle, he observed defendant make a throwing motion with his right arm, but did not observe anything leave defendant's hand. According to Rivera, after defendant threw the weapon "[h]e slowed down and pretty much gave up, laid on the ground." Rivera then placed defendant in custody.

¶ 6        Shortly thereafter, Lopez arrived at the scene in his police vehicle. Rivera informed him where the firearm was located. The owner of the property where the weapon appeared to have landed provided Lopez access to the yard so he could retrieve the handgun. Lopez retrieved a black handgun, which he testified was in plain view laying in the grass. Lopez returned to Rivera with the firearm, which Rivera recognized as the same one he observed defendant throw away. The firearm was loaded with one 9 mm bullet in the chamber and five live rounds in the magazine.

¶ 7        Lopez and Rivera drove defendant to the police station, where he was provided with the *Miranda* warnings. After waiving his rights, defendant informed Rivera and Lopez that he had the weapon due to the fact that, "The Latin Kings shot at him a few days prior so he needed a gun for protection." Rivera asked defendant if he was still a Two-Six member, and defendant replied, "yes" and indicated he had been a member for "several years." Defendant informed Rivera and Lopez that he was a member of the "63rd and Hamlin" faction of Two-Six.

¶ 8        Rivera testified that during the booking process, he observed a tattoo on defendant's right middle finger that consisted of three dots. Rivera testified that he had observed similar tattoos before and that they were worn by Two-Six gang members "to respect their gang." A photograph of defendant's tattoo as it appeared on August 30, 2011, was admitted into evidence. Another photograph of defendant making a gang symbol, which Lopez testified represented Two-Six, was also admitted into evidence. According to Rivera, defendant made this signal "on his own," but Rivera was not present when the photograph was taken.

¶ 9        Officer James Vins of the Chicago Police Department, currently assigned to the Bureau of Organized Crime Gang Investigations Division, testified as an expert in street gangs with an emphasis in Latino street gangs—including the Satin Disciples, the Two-Six, and the Latin Kings—without objection.

¶ 10        Vins testified that Two-Six is divided into geographic factions, which includes a faction known as "63rd and Hamlin" (referring to the area of 63rd Street and South Hamlin Avenue) in the Chicago Police Department's 8th District. According to Vins, Two-Six has a well-structured hierarchy that is "almost like a corporation." There is a nation chief, treasurer, enforcer, counsel, and a board of high ranking members. Underneath them are five regions, each with its own regional chief, enforcer, and treasurer. Below the regions are the chapters which also consist of a chief, a number two chief, an enforcer, and a treasurer.

¶ 11        According to Vins, the main rivals of Two-Six are the Latin Kings, and the conflict between them "goes back to the mid 70s starting out in the Little Village area." Vins testified that Two-Six uses violence to control their territory, including "murder, shootings, intimidation, arson, anything they could possibly think of to attack rival gang members."

¶ 12        Vins further testified regarding how members of Two-Six identify themselves. Tattoos specific to Two-Six include the "three dots" and the "bunny head," which are typically located

on the right side of the body. The Two-Six "gang sign" is "the bunny," which involves, in part, having one's middle finger extended outwards. The colors of Two-Six are beige and black.

¶ 13    In reviewing the reports and photographs associated with this incident, Vins observed that defendant had a "three dots" tattoo on his right middle finger and that defendant was "throwing up a 26 sign for his booking photo." Vins further noted that defendant was arrested in Two-Six territory, which was within a few blocks of Latin Kings territory. Vins opined that when defendant was arrested on August 30, 2011, defendant was a member of the Two-Six street gang.

¶ 14    On cross-examination, Vins testified that he relied on defendant's statements to the police on the day of his arrest as well as the computer database (the Chicago Police Department data warehouse system) for his opinion that defendant was a member of Two-Six. Vins further testified that he could only provide the name of one Two-Six member due to the fact the organization was being restructured. Vins also could not provide an exact number of members in the "63rd and Hamlin" faction of Two-Six.

¶ 15    Without objection, the State admitted into evidence a certified document from Master Sergeant Anthony McClure of the Firearms Services Bureau of the Illinois State Police, which stated defendant had never been issued a FOID card as of June 15, 2012. The State then rested.

¶ 16    Defendant testified as follows. At the age of 15, he commenced being a Two-Six member, which he testified involved going to batting cages, playing basketball, bowling, and frequenting McDonalds with friends. On August 30, 2011, he was not a gang member as three weeks prior he voluntarily had quit associating with Two-Six because he had heard about "ongoing violence" and "wanted to get out *** as quickly as possible."

¶ 17    On the evening of August 30, 2011, he was walking northbound on Karlov Avenue toward 59th Street when he observed Lopez exit a police vehicle. Defendant testified he was scared by Lopez and ran into the alley. Defendant continued running until he was instructed to stop or else he would be "tased." According to defendant, Lopez was being aggressive with him, kneed him in the groin, and then placed him in the back of a police vehicle while Lopez and Rivera searched garbage cans and yards. Ten to fifteen minutes later, the officers returned with a weapon. According to defendant, the officers attempted to get him to "give up" one of his friends, but after he refused to provide them with any names, they drove him to the 8th District police station.

¶ 18    Defendant was placed in a room alone and hours later was retrieved for booking. According to defendant, Lopez was present during the booking and ordered him to hold his fingers as they appeared in the photograph. Defendant denied informing the officers that he was a member of Two-Six and that he possessed the firearm because he was fearful of retaliation from the Latin Kings.

¶ 19    Defendant further testified that an older member of Two-Six tattooed him with the "three dots" tattoo when he was younger, that he did not know what the tattoo meant at the time and that he merely believed it to be "cool."

¶ 20    On cross-examination, defendant testified that, while he had been a Two-Six member for five years, he thought of it as a "club." He typically "hung out" with three to five people who also had the "three dot" tattoo.

¶ 21    The State presented the testimony of Lopez in rebuttal. According to Lopez, he was not present when defendant's booking photographs were taken. He also denied leaving defendant

alone in the police vehicle for 15 minutes and looking through garbage cans. He further denied being aggressive toward defendant or threatening to "tase" him.

¶ 22 Outside the presence of the jury, the trial court then conducted a jury instruction conference. During that conference, defense counsel did not propose, nor did the State or trial court suggest, that Illinois Pattern Jury Instructions 4.20 (defining "streetgang or gang") or 4.21 (defining "streetgang member or gang member") be provided to the jury. Illinois Pattern Jury Instructions, Criminal, Nos. 4.20, 4.21 (4th ed. 2000).

¶ 23 After hearing closing arguments and being instructed, the jury deliberated and ultimately found defendant guilty of unlawful possession of a firearm by a street gang member and AUUW, premised on defendant's lack of a valid FOID card. Thereafter, defendant filed a posttrial motion contesting the sufficiency of the evidence and the constitutionality of the unlawful possession of a firearm by a street gang member statute, which the trial court denied. Defendant was then sentenced to the statutory minimum sentence of three years' imprisonment on both counts. This appeal followed.

¶ 24                                    ANALYSIS

¶ 25 On appeal, defendant argues (1) that the evidence was insufficient to find him guilty of unlawful possession of a firearm by a street gang member beyond a reasonable doubt, where the State did not establish that Two-Six was a "street gang" as defined by the Act, (2) that the unlawful possession of a firearm by a street gang member statute is unconstitutional, (3) that trial counsel was ineffective for failing to request certain Illinois pattern jury instructions regarding pertinent statutory definitions or, in the alternative, that the trial court should have *sua sponte* provided those instructions, and (4) that his conviction for AUUW must be vacated under the one-act, one-crime doctrine. For the following reasons, we find defendant's first issue dispositive and, thus, decline to consider his remaining arguments.

¶ 26                            Sufficiency of the Evidence

¶ 27 Defendant maintains that while he was a member of Two-Six, the State failed to establish beyond a reasonable doubt that Two-Six is a "streetgang" as defined by the Act. Specifically, defendant asserts that no evidence was presented at trial which established that Two-Six was involved in a "course or pattern of criminal activity" as required by section 10 of the Act. Defendant requests that this court reverse his conviction for unlawful possession of a firearm by a street gang member, where the State has failed to satisfy its burden as to the elements of this charged offense.

¶ 28 On appeal, when the defendant challenges the sufficiency of the evidence, the reviewing court must determine, after viewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "This means the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *People v. Graham*, 392 Ill. App. 3d 1001, 1009 (2009).

¶ 29 It is within the function of the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in

the evidence. *Id.* It is not the duty of the trier of fact to accept any possible explanation that favors the defendant's innocence and "elevate[s] it to the status of reasonable doubt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009). A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 30    The State has an obligation to prove every essential element of the crime beyond a reasonable doubt. *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). To prove a defendant guilty of unlawful possession of a firearm by a street gang member, the State must prove that the defendant knowingly:

"possesses, carries, or conceals on or about his or her person a firearm and firearm ammunition while on any street, road, alley, gangway, sidewalk, or any other lands, except when inside his or her own abode or inside his or her fixed place of business, and has not been issued a currently valid Firearm Owner's Identification Card and is a member of a street gang[.]" 720 ILCS 5/24-1.8(a)(1) (West 2010).

¶ 31    The statute further provides:

"(c) For purposes of this Section:

'Street gang' or 'gang' has the meaning ascribed to it in Section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act.

'Street gang member' or 'gang member' has the meaning ascribed to it in Section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act." 720 ILCS 5/24-1.8(c) (West 2010).

¶ 32    The Act sets forth the pertinent definitions as follows:

" 'Streetgang' or 'gang' or 'organized gang' or 'criminal street gang' means any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." 740 ILCS 147/10 (West 2010).

The Act further provides that:

" 'Course or pattern of criminal activity' means 2 or more gang-related criminal offenses committed in whole or in part within this State when:

(1) at least one such offense was committed after the effective date of this Act;

(2) both offenses were committed within 5 years of each other; and

(3) at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony under the Criminal Code of 1961." *Id.*

¶ 33    There is only one decision in Illinois that has considered whether the State met its burden of proof with regards to establishing that a particular street gang was a "street gang" as defined by the Act. *People v. Jamesson*, 329 Ill. App. 3d 446 (2002). Defendant maintains, however, that Jamesson (1) was wrongly decided because the evidence in that case did not establish that the Latin Counts had committed two or more gang-related offenses within five years of each other after January 1, 1993, and (2) even if it is good law, that *Jamesson* is distinguishable.

¶ 34    In *Jamesson*, the defendant was charged with unlawful contact with a street gang member (720 ILCS 5/25-1.1 (West 1998)). *Jamesson*, 329 Ill. App. 3d at 449. During the bench trial, the State presented the testimony of Russell Schecht, a patrolman with the Addison police

department assigned to the gang tactical unit, and the trial court accepted him as an expert. *Id.* at 449-50. Schecht testified regarding his familiarity with the structured gangs in Addison, which included the Latin Kings and Latin Counts. *Id.* According to Schecht, Latin Counts gang members "from the Cicero area came to Addison and began heavily recruiting members several years ago." *Id.* at 450. With respect to the Latin Counts, Schecht testified regarding the organization's hierarchy and described them as "a violent street gang in Cicero and, in Addison, they have been in numerous violent incidents involving narcotics, batteries, aggravated batteries, assaults, and numerous other criminal activities." *Id.* Schecht further testified that the Latin Counts are identified by the colors red and black and that they "display their colors and 'represent' to the left side of the body. For example, they may wear their hats tilted to the left side or wear bandannas on their heads with the knot turned to the left." *Id.*

¶ 35 Regarding the defendant, Schecht testified that he was familiar with the defendant and had numerous prior contacts with him. *Id.* Schecht further testified that defendant admitted to him and other officers "on a number of occasions that he is a Latin Counts gang member." *Id.*

¶ 36 As to the offense in question, Schecht testified that while he was on routine patrol, he observed two known gang members, George Soria and Sam Banuelos, standing between two apartment buildings with the defendant. The defendant "was wearing a red jacket, a red Cincinnati Reds hat tilted to the left, and a red bandanna on the left side of his pants or belt loop." *Id.* Schecht testified that Banuelos had admitted to him that he was a gang member. *Id.*

¶ 37 Schecht further testified regarding "gang contact cards, which are used to keep a record of contacts between officers and gang members." *Id.* at 451. One of the cards indicated that an officer had contact with Banuelos and the defendant in August 1999 and that the contact resulted in both the defendant and Banuelos being charged with possession of cannabis. *Id.* Other cards indicated defendant was present with either Banuelos or Soria and was issued loitering tickets. *Id.*

¶ 38 Schecht opined that "based on previous contacts with Banuelos and his associates, previous records, and the area where Banuelos was observed, Banuelos was a Latin Counts gang member" on the day the defendant was observed with him as was Soria. *Id.* Schecht further testified regarding his conversation with the defendant on the date of the offense and that the defendant "admitted to Schecht that he knew he had a no-gang-contact order and was not supposed to be with Soria or Banuelos." *Id.* The trial court ultimately found defendant guilty of committing the offense of unlawful contact with a street gang member. *Id.*

¶ 39 On appeal, the defendant challenged the sufficiency of the State's evidence, namely that the State failed to prove that the Latin Counts was a street gang as defined in the Act (740 ILCS 147/10 (West 1998)). *Jamesson*, 329 Ill. App. 3d at 458. The Second District, however, concluded that a rational trier of fact could have determined beyond a reasonable doubt that the defendant was guilty of that offense and that the evidence supported the trial court's guilty verdict. *Id.* at 461. In so finding, the reviewing court noted the following evidence:

> "At trial, the State presented evidence establishing that on September 24, 1999, two days after the trial court sentenced defendant to supervision with the condition that he have no contact with Banuelos or any other known gang members, Officer Schecht saw defendant in the presence of Banuelos and Soria, another known gang member. Banuelos and Soria had previously admitted to Schecht that they were Latin Counts gang members. Defendant purportedly admitted to Schecht his awareness of the no-gang-contact order and his knowledge that he was not supposed to be with Banuelos

and Soria. Schecht testified as an expert witness on gangs and as an occurrence witness. Schecht described the location of the incident, Michael Lane, as an area where 'literally hundreds of gang contacts' occurred. Schecht described their clothing, the significance of the colors, and the manner in which they were attired.

Schecht further testified regarding his duties, which included collecting and trading information and educating others about gangs. As an expert witness, Schecht testified regarding his familiarity with the structured street gangs in Addison and, specifically, the Latin Counts. Schecht testified regarding his knowledge of the hierarchy and structure of the Latin Counts, which include a president and a type of treasurer. He was aware that ledgers existed and showed whether dues were paid. He testified that the Latin Counts are a People gang under the People nation and the Addison police department began to have contact with them a couple of years ago. He explained the recruitment efforts of the Latin Counts. Schecht described the Latin Counts as a violent street gang in Cicero and, in Addison, they had been involved in numerous violent incidents. Their involvement includes narcotics, batteries, aggravated batteries, assaults, and numerous other criminal activities. Schecht opined that the Latin Counts organization was a street gang and that Banuelos and Soria were Latin Counts gang members." *Id.* at 459-60.

¶ 40      Relying on *Richardson v. Chapman*, 175 Ill. 2d 98, 107 (1997), and *People v. Terrell*, 185 Ill. 2d 467, 496-97 (1998), the *Jamesson* court observed that, "Although Schecht did not testify as to specific dates or specific incidents, the trial court was free to accept or reject Schecht's opinions that the Latin Counts were a street gang that engaged in a course or pattern of criminal activity." *Jamesson*, 329 Ill. App. 3d at 460. The court further noted that, "Schecht testified that the police department began to have contact with the Latin Counts 'a couple of years ago' and that the Latin Counts have been involved in numerous violent incidents." *Id.* at 460-61. Thus, the *Jamesson* court concluded that because the testimony established that the Latin Counts began their criminal activity in Addison "a couple of years ago" and that one of those offenses involved aggravated battery, a felony, the trial court "properly could have found that the offenses occurred within five years of each other," thus satisfying the element that the Latin Counts was engaged "in a course or pattern of criminal activity." *Id.* at 461 (citing 740 ILCS 147/10 (West 2000)).

¶ 41      We cannot say that *Jamesson* was wrongly decided as the reviewing court had before it the complete record and considered the sufficiency of the evidence on the unique facts of that specific case. We do, however, find *Jamesson* to be distinguishable on its facts from the case at bar. The statutory definition of the phrase "course or pattern of criminal activity" requires the State to establish that there have been "2 or more gang-related criminal offenses committed in whole or in part within this State" (1) after January 1, 1993, (2) where both offenses were committed within 5 years of each other and (3) at least one of those offenses "involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony." 740 ILCS 147/10 (West 2010). The *Jamesson* court relied on the testimony of a gang expert, which established that as of the time of trial (defendant was charged in September 1999), his contact with the Latin Counts in Addison occurred "a couple of years ago" and that the Latin Counts had engaged in "numerous violent incidents," including felonies. *Jamesson*, 329 Ill. App. 3d at 460. Unlike in *Jamesson*, Vins did not testify that his contact with Two-Six began "a couple of years ago." Instead, Vins testified

that Two-Six and the Latin Kings had been rivals in the 8th District dating back to the 1970s and that Two-Six used violence, including "murder, shootings, intimidation, [and] arson" to control its territory.

¶ 42    Thus, what remains at issue in this case is whether the evidence established that Two-Six was involved in "a course or pattern of criminal activity" so as to fall within the definition of "street gang" under the Act. Vins testified that since the 1970s, Two-Six had been engaged in a rivalry with the Latin Kings over territory within the 8th District. Although Vins testified that Two-Six used violence to control their territory including "murder, shootings, intimidation, [and] arson," no testimony was elicited regarding the time frame of these crimes, except to say generally that they had been occurring since the 1970s. The Act requires that at least one of the two required offenses be committed after the effective date of the Act, *i.e.*, January 1, 1993. 740 ILCS 147/10 (West 2010). The testimony at trial failed to demonstrate that a gang-related criminal offense was committed by or through a member of Two-Six after January 1, 1993. Nor was any evidence presented to establish that two such offenses had been committed within five years of each other. See *id.* Accordingly, the State failed to prove an element of the offense of unlawful possession of a firearm by a street gang member beyond a reasonable doubt.

¶ 43    We further observe that, like the gang expert in *Jamesson*, Vins provided his expert opinion to the jury on an ultimate issue in the case, whether defendant was a member of a street gang. In relying on the expert's opinion, the *Jamesson* court set forth the rule that an expert may provide an opinion on an ultimate issue in the case "because the trier of fact is not required to accept the witness's conclusion, the testimony cannot be said to usurp the province of the trier of fact." *Jameson*, 329 Ill. App. 3d at 460 (citing *Terrell*, 185 Ill. 2d at 496-97). We initially note that *Jamesson* involved a bench trial, whereas defendant here was convicted by a jury. Importantly, in a bench trial, the judge is presumed to know the law that applies. *People v. McCoy*, 207 Ill. 2d 352, 357 (2003). In contrast, a jury must be properly instructed on the law. See *People v. Delgado*, 376 Ill. App. 3d 307, 314 (2007) ("in a criminal case the trial court is responsible for fully instructing the jury on the elements of the offense, the burden of proof and the presumption of innocence"). In this instance, the jury cannot consider Vins's opinion that defendant belongs to a "street gang" in accordance with its plain and ordinary meaning, as the legislature has provided a specific definition for that term. See *People v. Ramsey*, 239 Ill. 2d 342, 435 (2010). Thus, where, as here, the jury was not provided with the statutory definitions of "street gang" and "course or pattern of criminal activity," we cannot say that the trier of fact could properly consider Vins's opinion in light of the applicable law.

¶ 44    Reviewing the evidence in the light most favorable to the prosecution, we find the State failed to establish a basic element of the offense: that Two-Six was a street gang that engaged in a course or pattern of criminal activity. See 720 ILCS 5/24-1.8 (West 2010); 740 ILCS 147/10 (West 2010). Accordingly, we conclude the State failed to prove defendant guilty beyond a reasonable doubt of unlawful possession of a firearm by a street gang member and reverse his conviction.

¶ 45    As we have concluded that defendant's conviction for unlawful possession of a firearm by a street gang member must be reversed, we need not consider defendant's remaining arguments regarding the constitutionality of section 24-1.8 of the Code (720 ILCS 5/24-1.8 (West 2010)) or trial counsel's failure to request certain jury instructions. See *People v. White*, 2011 IL 109689, ¶ 148 ("it is a fundamental rule of judicial restraint that a court not reach constitutional questions in advance of the necessity of deciding them" (emphasis omitted));

*People v. Williams*, 383 Ill. App. 3d 596, 644 (2008) (declining to consider the defendant's alternative arguments where the reviewing court reversed the defendant's conviction due to unsatisfactory evidence). We observe that, although defendant's conviction for unlawful possession of a firearm by a street gang member is reversed, the jury also convicted him of aggravated unlawful use of a weapon predicated on defendant not having been issued a currently valid FOID card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2010)), and the trial court sentenced defendant to three years' imprisonment on this count. It is not disputed that there was sufficient evidence to convict defendant of the offense of AUUW, and our review of the record supports the jury's determination. Accordingly, defendant's AUUW conviction is affirmed. See *People v. Davis*, 2016 IL App (1st) 142414, ¶ 18.

¶ 46                                      CONCLUSION

¶ 47        For the reasons stated, defendant's conviction for unlawful possession of a firearm by a street gang member is reversed; however, defendant's conviction for AUUW is affirmed.

¶ 48        Affirmed in part; reversed in part.

¶ 49        PRESIDING JUSTICE GORDON, dissenting.

¶ 50        In this appeal, the majority reversed defendant's conviction for unlawful possession of a firearm by a street gang member on the ground that the State had failed to prove that the Two-Six gang was a street gang engaged in a course or pattern of criminal activity. *Supra* ¶ 44. For the reasons explained below, I must respectfully dissent.

¶ 51        On this appeal, defendant argued that the State failed to prove that the Two-Six gang met the statutory definition of a street gang for two separate reasons. Defendant argued that the State failed to prove (1) that the Two-Six gang constituted a confederation of three or more people and (2) that the Two-Six gang had committed the requisite number of offenses within the requisite time frame specified by the statute.

¶ 52        First, defendant argues that the State failed to prove that the Two-Six gang constituted a confederation of three or more people because the State's expert could identify only one person who was a member of the Two-Six gang. However, as the majority observes in its opinion, the State's expert testified that the Two-Six gang has a well-structured hierarchy which is "almost like a corporation," with (1) a nation chief, (2) a treasurer, (3) an enforcer, (4) counsel, and (5) a board of high ranking members. *Supra* ¶ 10. That is already more than three people. In addition, he testified that underneath them are five regions, each with its own (1) regional chief, (2) enforcer, and (3) treasurer. *Supra* ¶ 10. The total of just the regional leaders brings the total to 15, which is far more than the three persons required by statute. Thus, I do not find this argument persuasive.

¶ 53        Next, defendant argues that the State failed to prove the requisite number of offenses, namely (1) two or more gang-related offenses in Illinois since January 1, 1993, (2) two or more offenses occurring within five years of each other, and (3) at least one felony.

¶ 54        The State could have done a simple online search and printed out all the opinions and orders showing convictions involving Two-Six gang members and then asked the trial court to take judicial notice—but it did not do that. *E.g.*, *People v. Gallegos*, 2016 IL App (1st) 133568-U, ¶ 18; *People v. Anima*, 2016 IL App (1st) 140504-U, ¶ 5. See also *People v.*

*Molina*, 2016 IL App (1st) 131945-U, ¶ 6 (an officer testified about " 'a major gang conflict' happening in the area at the time [(2011)] between the Latin Kings and the Two-Six gang"). *People v. Salas*, 2011 IL App (1st) 091880, ¶ 37 ("Defendant was a member of the Two-Six street gang"); *People v. Salgado*, 396 Ill. App. 3d 856, 859 ("Two-Six street gang"). The State has the burden of proving each element of the offense to the jury beyond a reasonable doubt, and the State has not argued to the trial court or on this appeal that we should take judicial notice of prior Two-Six gang convictions. Thus, one of the questions before us on this appeal is whether any rational trier of fact could have found this element beyond a reasonable doubt based on the evidence that was actually presented to it.

¶ 55     The record contains sufficient evidence to support this element. Officer James Vins, the State's gang expert, described the current state of the Two-Six gang in detail—its current hierarchy, its current boundaries, and its current gang signs. Vins further testified that the Two-Six gang used "murder, shootings, intimidation, arson, anything they could possibly think of to attack rival gang members." Defendant argues that Vins' description of these offenses could have been a historical reference, since the Two-Six gang and the Latin Kings have been rivals since the 1970s, which is before the effective date of the Act. However, whether this was a current or historical reference by Vins was a question of fact for the jury to determine, and the jurors were free to conclude, as they apparently did, that Vins was speaking of the present when he testified that the Two-Six gang's violence included "murder, shootings, intimidation, arson," and other attacks.

¶ 56     Thus, I do not find defendant's arguments persuasive on this issue.

¶ 57     I think this issue is akin to forensic testing, in the sense that once it is established that a particular forensic test is generally accepted in the relevant scientific community, as those terms are defined by rules and case law, there is no need to relitigate that fact, unless something has changed. Similarly, there is no need for the State to relitigate whether a particular gang is a street gang in the relevant community, as those terms are defined by statute and case law, unless something has changed and defendant has placed this fact at issue.

¶ 58     There is no question that the State has the burden of proving each element of an offense to the jury beyond a reasonable doubt, and whether defendant was a member of a street gang is an element of the offense. However, the defense failed to ask the trial court to give the statutory definition of this term to the jury, thereby making the strategic decision to waive jury consideration of whether this definition was met. There are relevant pattern jury instructions explaining both "streetgang" and "streetgang member" (Illinois Pattern Jury Instructions, Criminal, Nos. 4.20, 4.21 (4th ed. 2000)), but defense counsel made the strategic decision not to request either one.

¶ 59     In fact, defense counsel repeatedly referred—himself—to the Two-Six gang as a street gang throughout the trial, and he never argued in his closing that the Two-Six gang was not a street gang or that the State had failed to prove this fact. The defense's strategy was to argue that defendant was not a member of this gang on the date of the offense.

¶ 60     Thus, the issue before us concerns a situation where the defense has made the apparently strategic decision at trial not to seek a jury determination of a particular fact and appears to have, in essence, conceded that fact at trial. In sum, the question before us is whether we should reverse on the issue of whether a particular gang is a street gang as that term is statutorily defined, when the fact is supported by case law, the State's evidence at trial, and defendant's own tacit concession?

¶ 61     I would answer no, and therefore, I must respectfully dissent.